**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

CONSTELLIUM ROLLED PRODUCTS RAVENSWOOD, LLC,

        Plaintiff,

v.                             CIVIL ACTION NO.  2:15-cv-13438

KENNETH ROGERS,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants' Motion for Summary Judgment.  (ECF No. 92.)  For the reasons that follow, the motion is **GRANTED IN PART** and **DENIED IN PART**.

*I.     BACKGROUND*

Plaintiff Kenneth Rogers brings this lawsuit against his former employer, Constellium N.V. and its subsidiary, Constellium Rolled Products Ravenswood, LLC (collectively "Constellium").[1] Plaintiff was formerly employed as the Vice President of Human Resources for Constellium's North America operations.  Also named as Defendants are Marc Boone, Plaintiff's former supervisor and Constellium's Vice President of Human Resources, and Lloyd Stemple, the Chief Executive Officer of Constellium's plant in Ravenswood, West Virginia.  Plaintiff claims he was terminated from his employment in violation of the West Virginia Human Rights Act

---

[1] Constellium has its own lawsuit pending against Plaintiff.  The two cases have been consolidated. Constellium's action was filed first and designated as the lead case.  For purposes of the pending summary judgment motion, which relates only to the lawsuit filed by Rogers, the Court refers to Rogers as "Plaintiff" and those parties named in his lawsuit as "Defendants."

("WVHRA"), West Virginia Code § 5-11-1 *et seq.*, and the public policy of the State of West Virginia.

The following facts are construed in the light most favorable to Plaintiff. Plaintiff is African-American. During his tenure with Constellium, he was the only African-American member of Constellium's senior management in North America and the only black member of Constellium's international human resources ("HR") management team. (Boone Dep. 250.) Plaintiff was also the only African-American officer at Constellium's Ravenswood plant. He began working as Constellium's Vice President of HR in North America on September 15, 2014. (*See* Am. Compl. ¶ 7.) Boone made the hiring decision. (Rogers Dep. 91–92.) On July 14, 2015, Constellium terminated Plaintiff's employment for cause. (Stemple Dep. 137.)

Constellium cited poor performance as a reason for Plaintiff's termination, but the parties dispute the veracity of this claim. Plaintiff's performance evaluations provide some insight. In an employment assessment of March 2015, Plaintiff was rated at a level 9, corresponding with "insufficient performance." (Boone Dep. 231:1–9.) A level 9 is the "lowest possible score in a category in Constellium's rating system." (Rogers Aff. 5, ECF No. 97-1.) Plaintiff also received a 2 out of 5 rating in "overall performance." (Rogers Dep. 264.) Boone completed the evaluation. Plaintiff denied notice of the low ratings, and indeed his Amended Complaint alleges that he received a rating of 3 out of 5 in overall performance. (Am. Compl. ¶ 9.) Curiously, during that same month, Boone rated Plaintiff as "100% on target" for each of his individual objectives. (Boone Dep. 151–152.) Boone later scheduled a meeting on July 2, 2015 to discuss Plaintiff's performance; however, Plaintiff never received notification of the meeting and therefore did not

participate as planned.  (Rogers Dep. 261–62.)  There is no record of any formal disciplinary action taken against Plaintiff during his brief tenure with Constellium.

Apart from Plaintiff's alleged underperformance, Constellium cited other reasons for firing him.  These included "irregularities" related to Plaintiff's claims for expense reimbursement and, more significantly, concerns that Plaintiff falsified an affidavit related to a lien against his prior residence in order to secure the sale of his home through Constellium's executive relocation policy.  (Termination Letter 1, ECF No. 99-4.)  When Plaintiff began his employment, he was tasked with the development of an executive relocation policy.  The policy was implemented on January 27, 2015, with retroactive application to January 1, 2015.  (*See* Email from Rogers to Stemple, ECF No. 92-2 at 51.)  The policy provided for the Constellium's purchase of the home of a new executive in order to facilitate the executive's relocation.  (*Id.* at 40–41.)  In Plaintiff's case, the policy afforded him the opportunity to sell his Texas home and relocate to West Virginia.

Under the policy's "Guaranteed Buyout Program," the executive could choose to have the relocation firm purchase his or her home if a suitable buyer did not turn up during a defined marketing period.  Plaintiff ultimately elected to pursue this option.  In March 2015, and while investigating the title on Plaintiff's Texas home, the relocation firm notified Plaintiff that the title search revealed an outstanding lien against the property.  (Rogers Aff. at 6.)  Plaintiff was not aware of any lien against his home, nor of any unpaid judgment against him in Lamar County, Texas.  (*Id.*)  In any event, he assumed the lien was invalid because he understood Texas law to prohibit judgment liens on a primary residence.  (*Id.*)  Plaintiff signed a "not same person" affidavit to move the sale forward.  (Not Same Person Aff. 1, ECF No. 92-2 at 54.)

The lien proved troublesome when the relocation firm tried to sell Plaintiff's Texas home to a third party in June 2015. At that time, the relocation firm provided Plaintiff with documentation of the judgment lien at issue. This included a document entitled "Note, Disclosure, and Security Agreement," revealing a loan from a Texas bank to Plaintiff dated September 30, 2011 in the amount of $34,733.21. (ECF No. 92-2 at 63–66.) With this revelation, Constellium demanded that Plaintiff repay the money it had paid into escrow—an alleged $62,000. Plaintiff refused. On June 26, 2015, Plaintiff drafted an email to Boone explaining his perspective. He wrote, in part:

> I still to this day have not received any documents, emails etc., referencing the $62,000. Names, dates, institutions, signatures have not been made available to me from the Company. [The relocation company] under instructions from someone are keeping their distance. Only the paperwork you showed me which are the same ones that I've seen from Buddy [Stemple] and [the relocation company] are available. None of which mentions the $62,000, escrow company, title company, amounts, or contacts. I had to retain an attorney to research information. The quick decision that was made by the Company to pay the amount is still strange and confusing, but it cannot be reversed. Never-the-less, I am hopeful that we will quickly come to some type of resolution that will remove the Company from any liability.

(ECF No. 92-2 at 70.) Stemple and Boone terminated Plaintiff's employment several weeks later.

Plaintiff believes more insidious motivations lay behind his termination. His Amended Complaint involves claims of racial discrimination. While employed with Constellium, the privileges of Plaintiff's employment differed from the white officers with whom he worked. Constellium issued pay raises to Ravenswood employees in March 2015. Plaintiff, Stemple, and Derek Scantlin, the Chief Financial Officer, all received raises. Plaintiff's .9% raise was lower than those of Scantlin and Stemple, although Plaintiff's pay grade was higher than Scantlin's. (Stemple Dep. 150–51.) When Plaintiff questioned Boone about the difference in pay, Boone

explained that Plaintiff's pay raise was pro-rated due to his short tenure. However, Scantlin's tenure in his position exceeded Plaintiff's by only six months. (Boone Dep. 145–48.) Plaintiff also asked to refurbish his Ravenswood office upon his arrival. Stemple refused to approve Plaintiff's request, though at least one other employee with less responsibility than Plaintiff received permission to refurbish his office.

Boone also revoked certain job responsibilities from Plaintiff shortly after Plaintiff's start date. December 4, 2014, Plaintiff attended his first face-to-face meeting with Boone since being hired. (Boone Dep. 7.) The meeting occurred in France and was part of a retreat for all Constellium HR managers. Though Plaintiff had accepted employment with Constellium on the premise that he would be responsible for HR operations throughout North America, Boone informed Plaintiff at this meeting that he would no longer have HR authority over Constellium's plant in Muscle Shoals, Alabama. (Rogers Dep. 302.) Boone intended to be directly responsible for HR services at the plant. (Boone Dep. 10.)

Plaintiff's suspicions of discriminatory animus grew. While attending a dinner during the same retreat, Boone shared an off-color joke with Plaintiff and his colleagues. The Amended Complaint describes the joke in detail and alleges:

> Later that evening, Constellium human resource managers attended a dinner on board a boat cruising the River Seine. [Defendant] Boone told a joke at the dinner, stating that a white man had his wife's name tattooed on his penis that the white man's penis revealed only two letters of the tattoo normally, but when the white man's penis was erect the tattoo on the penis went from the first two letters which were normally visible (WY) to the entire name of his wife (Wendy). One day while on vacation in Jamaica this white man was standing at the urinal next to a black man and looked down and noticed that the black man had the initials WY tattooed on his penis too. The white man stated to the black man "I couldn't help but notice your tattoo, is your wife named Wendy also?" The black man replied "No way man. I work for a tourist company and when women get me aroused my penis reads 'Welcome to Jamaica, have a nice day.'"

(Am. Compl. ¶¶ 20, 21; Boone Dep. 20–21 (conceding the joke, which Boone described as a "case study," was described accurately in Plaintiff's pleading).)

Plaintiff was the only black individual on the river cruise, a fact of which Boone had apparently taken note. Plaintiff testified that Boone subsequently harassed him, hearkening back to his "Wendy" joke, on two occasions. The first incident occurred in March 2015 while Plaintiff and Boone attended mid-year management meetings in Amsterdam. While in Amsterdam for meetings, Plaintiff happened to be using the restroom at the same time as Boone. Boone stood beside Plaintiff at the bank of urinals, looked down toward Plaintiff's penis, and asked, "How's Wendy?" (Rogers Dep. 312.) The second occurred on June 17, 2015 while Boone was visiting the Ravenswood facility. Boone came upon Plaintiff using the men's restroom. Boone occupied the urinal next to Plaintiff's and asked the same question: "How's Wendy?" Plaintiff did not respond. Plaintiff recalled these events at his deposition. "When he would stand beside me at the urinal and say, 'How is Wendy?' [it] was degrading and insulting to me and was a message for me to stay in my place or that he saw me only a certain way, reminded me that he saw me as a black man and not as a professional or like the other people." (*Id.*)

Plaintiff's Amended Complaint also includes allegations of reprisal related to gender discrimination. During Plaintiff's first days on the job, he became aware of a company investigation into the conduct of Steve Mosser, a former employee. (Rogers Dep. 273.) Mosser had resigned before Plaintiff's start date in the wake of sexual harassment allegations lodged against him by various female employees at the Ravenswood plant.[2] (*Id.*) Plaintiff learned that

---

[2] Rogers is the sole source of testimony that Mosser had been accused of sexual harassment. Stemple testified that the company looked into Mosser's conduct only because it had previously opened an investigation of an employee in the same department. Stemple indicated that the Mosser investigation

Mosser would be briefly returning to Constellium's Ravenswood location to finish an uncompleted project. Plaintiff grew concerned about Mosser being on the worksite with exposure to the women he had allegedly harassed. He advised Stemple that Mosser should not be allowed in the Ravenswood plant. Nevertheless, Mosser returned to Constellium's Ravenswood plant, if only briefly, on three separate occasions. During the second visit, Mosser attended a meeting with one of the female employees he had allegedly harassed. The female employee complained to Plaintiff about Mosser's presence at the meeting. (Rogers Dep. 275.) When Mosser was scheduled to return to the plant the third time, this time as a representative of an important customer, Plaintiff again cautioned Stemple against permitting him entrance. Stemple did not heed Plaintiff's advice. Plaintiff claims his termination was motivated, in part, by these complaints.

Also as relevant to his gender discrimination retaliation claim, Plaintiff describes a meeting with Stemple and other members of the Ravenswood leadership team. During the meeting, the discussion turned to a lawsuit filed against Constellium by female employees. West Virginia's appellate court had just issued a decision unfavorable to Constellium. *See Constellium Rolled Products Ravenswood, LLC v. Griffith*, 775 S.E.2d 90 (W. Va. 2015). Stemple purportedly expressed outrage, using the term "bitches" to refer to the female plaintiffs. (Rogers Dep. 283.)

Plaintiff further claims that Constellium terminated his employment in retaliation for resisting age discrimination. According to Plaintiff, Boone had a practice of preferring young candidates for vacant positions. While reviewing applications for managerial positions at the Ravenswood plant, Boone repeatedly expressed a preference for applicants below the age of 35.

revealed several "inappropriate emails." When confronted with the emails, Mosser promptly resigned. (Stemple Dep. 17.) Stemple denied knowledge of any sexual harassment complaints against Mosser by Constellium employees. (*Id.*)

(Rogers Dep. 290.)   In April 2015, Plaintiff and Boone conversed via email about a specific job vacancy at the plant.   Plaintiff proposed a particular candidate to fill the vacancy, but Boone responded that he "would like to see a younger individual so we can develop the team for the long term."   (Boone Dep. 238.)   Plaintiff insisted on hiring an older applicant.   When asked about Boone's response, Plaintiff testified without elaboration, "I don't think he liked that."   (Rogers Dep. 290.)

Plaintiff's Amended Complaint includes five counts.   Counts I, II, IV, and V arise under the WVHRA and allege retaliation in response to gender and age discrimination, race discrimination, and racially hostile work environment.   Count III alleges a common-law claim for retaliation in violation of the substantial public policy found in the Health Insurance Portabilitiy and Accountability Act ("HIPAA").[3]   Count III finds footing in the West Virginia appellate court's decision in *Harless v. First National Bank*, 246 S.E.2d 270 (W. Va. 1978), and is commonly known as a *Harless* claim.   At a telephonic status conference held April 25, 2017, Plaintiff voluntarily dismissed the *Harless* claim with the consent of Defendants.   Defendants' Motion for Summary Judgment remains pending as to Counts I, II, IV, and V.   The motion has been fully briefed and is ready for disposition.

## II.   *LEGAL STANDARD*

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. That rule provides, in relevant part, that summary judgment should be granted if "there is no genuine issue as to any material fact."   Summary judgment is inappropriate, however, if there exist factual issues that reasonably may be resolved in favor of either party. *Anderson v. Liberty*

---

[3] As this claim has been dismissed, the Court does not discuss its evidentiary basis.

*Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). When construing such factual issues, the Court must view the evidence "in the light most favorable to the [party opposing summary judgment]." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The moving party may meet its burden of showing that no genuine issue of fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under request for production." *Barwick v. Celotex Corp.,* 736 F.2d 946, 958 (4th Cir. 1984). Once the moving party has met its burden, the burden shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). If a party fails to make a sufficient showing on one element of that party's case, the failure of proof "necessarily renders all other facts immaterial." *Id.* at 323.

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 256. "The mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to withstand summary judgment; the judge must ask whether "the jury could reasonably find for the plaintiff." *Id.* at 252.

### III.    DISCUSSION

Under the WVHRA, it is unlawful for an employer "to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment" on the

basis of race, gender, or age.   W. Va. Code §§ 5-11-3(h), 9(1).   The WVHRA also creates a cause of action when an employer engages in any form of reprisal for an employee's participation in protected activity, *i.e.*, an employee's opposition to any unlawful employment practice.   *Frank's Shoe Store v. W. Va. Human Rights Comm'n*, 365 S.E.2d 251, 258 (W. Va. 1986); W. Va. Code § 5-11-9(7)(A).

The WVHRA, like other state laws, is often analyzed under its federal equivalents—in this case, Title VII of the Civil Rights Act.   Accordingly, the Supreme Court of Appeals of West Virginia construes the WVHRA to coincide with Title VII, unless the West Virginia statute directs otherwise.   *See Hanlon v. Chambers*, 464 S.E.2d 741, 754 (W. Va. 1995) (citations omitted).   Whether arising under Title VII or the WVHRA, claims of discrimination and retaliatory discharge share the same analytical framework.   There are two avenues by which a plaintiff may defeat summary judgment.   *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) (citation omitted).   The first, less common method involves the plaintiff putting forward direct evidence that illegal discrimination motivated the employer's adverse employment decision.   *Id.*   Direct evidence is evidence from which no inference need be drawn.   *Id.*

Alternatively, a plaintiff lacking direct evidence of an employer's discriminatory intent may avoid summary judgment by using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to raise an inference of illegal conduct.   The *McDonnell-Douglas* analysis compensates "'for the fact that direct evidence of intentional discrimination is hard to come by.'"   *Diamond*, 416 F.3d at 318 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 271 (1989) (O'Connor, J., concurring in the judgment)).   Proceeding in this manner, the plaintiff must first come forward with evidence establishing a prima facie case of

discrimination or retaliation, as the case may be. *See id.* The employer must then articulate a legitimate, non-discriminatory reason for the adverse employment action. If the employer responds to the employee's claim with some evidence,[4] the plaintiff must demonstrate the employer's reasons are "actually a pretext for discrimination." *Id.* (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004). To survive a motion for summary judgment, the plaintiff must develop some evidence from which a reasonable jury could conclude that improper motive was behind the employer's action. *Skaggs v. Elk Run Coal Co., Inc.*, 479 S.E.2d 561, 582 (W. Va. 1996).

"Pretext" as it relates to unlawful discriminatory employment practices "means an ostensible reason or motive assigned as a color or cover for the real reason or motive, or false appearance, or pretense." *Mayflower Vehicle Sys., Inc. v. Cheeks*, 629 S.E.2d 762, 773 (W. Va. 2006). Pretext of this nature may be shown by the plaintiff through several forms of evidence: "(1) comparative evidence, (2) statistical evidence, and (3) direct evidence of discrimination, in the form of discriminatory statements and admissions." *Charleston Town Ctr. Co., LP v. W. Va. Human Rights Comm'n.*, 688 S.E.2d 915, 921 (W. Va. 2009) (quoting *Miles v. M.N.C. Corp.*, 750 F.2d 867, 870 (11th Cir. 1985)). If a plaintiff can show, through direct or circumstantial evidence, that the employer's nondiscriminatory reason for the employment decision is dishonest and a pretext, then discrimination may be inferred. *See Mayflower Vehicle Sys.*, 629 S.E.2d at 773 (citing *Barefoot v. Sundale Nursing Home*, 457 S.E.2d 152 (W. Va. 1995)).

---

[4] The employer's reason "need not be a particularly good one." *Conaway v. E. Associated Coal Corp.*, 358 S.E.2d 423, 430 (W. Va. 1986). It need only be a reason for the adverse employment action other than plaintiff's membership in a protected class or participation in protected activity. *Id.*

*A.      Retaliation or Reprisal Based on Age and Gender Discrimination*

Plaintiff alleges Constellium terminated his employment in retaliation for his complaints about age and gender discrimination. Plaintiff admittedly has no direct evidence of retaliation in this regard, and the parties agree that he can prove his claim, if at all, by establishing a prima facie case.

The Supreme Court of West Virginia has held that in employment discrimination cases, "[t]he showing the plaintiff must make as to the elements of the prima facie case in order to defeat a motion for summary judgment is *de minimis.*"  *Nestor v. Bruce Hardwood Floors, L.P.*, 558 S.E.2d 691, 694 (W. Va. 2001).   To prove a prima facie case of retaliation, the employee must produce evidence on each of the following elements: "1) engagement in protected activity; 2) that the employer knew of protected activity and took adverse employment action against Plaintiff; and 3) a causal relationship between the protected activity and adverse employment action."  *Cooper v. Norfolk & W. Ry. Co.*, 870 F. Supp. 1410, 1418 (S.D. W. Va. 1994) (citing *Brammer v. W. Va. Human Rights Comm'n*, 394 S.E. 2d 240 (W. Va. 1990)); *see also Freeman v. Fayette Cty. Bd. of Educ.*, 599 S.E.2d 695, 700 (W. Va. 2004).   Directly complaining to an employer about a discriminatory practice typically falls within the realm of protected activity. *See Hanlon v. Chambers*, 464 S.E.2d 741, 753 (W. Va. 1995) (defining "protected activity" as opposition to a practice prohibited by the WVHRA).   The Court discusses Plaintiff's success in demonstrating a genuine factual dispute on the elements of a prima facie case, first as to the retaliation based on age discrimination claim and then to the companion claim based on gender discrimination.

*i.      Age Discrimination*

Defendants contend that Plaintiff did not engage in protected activity by discouraging

Boone from engaging in age discrimination. By doing so, Defendants reason, Plaintiff was simply performing his duties as an HR manager. Their argument implies that because HR representatives are typically tasked with the investigation of discrimination complaints in the workplace, an employee in an HR position can never engage in protected activity by opposing an employer's discriminatory practice. Defendants paint with too broad a brush. In the context of Title VII, a federal appeals court recently held that an HR representative may engage in protected activity, notwithstanding his or her job responsibilities:

> To the extent an employee is required as part of her job duties to report or investigate other employees' complaints of discrimination, such reporting or investigating by itself is not a protected activity . . . , because merely to convey others' complaints of discrimination is not to oppose practices made unlawful by Title VII. But if an employee—even one whose job responsibilities involve investigating complaints of discrimination—actively "supports" other employees in asserting their Title VII rights or personally "complains" or is "critical" about the "discriminatory employment practices" of her employer, that employee has engaged in a protected activity[.]

*Littlejohn v. City of New York*, 795 F.3d 297, 318 (2d Cir. 2015) (citation omitted). Thus, the question whether an employee's conduct falls within the scope of protected activity does not hinge on whether the activity is within the scope of the employee's job responsibility. *Id.* The appropriate question is whether the HR employee personally advocated his belief that discrimination occurred. The Second Circuit's rationale serves an important policy purpose. It encourages HR personnel—who typically possess greatest expertise in this area—to speak up against unlawful employment practices in the workplace.

In this case, the evidence supports an inference that Plaintiff engaged in protected activity. When it comes to Plaintiff's complaints about Boone's hiring practices, there is nothing to indicate that any applicant was made aware, much less complained of, any preference on Boone's part for

13

younger applicants. Rather, the evidence indicates that Plaintiff learned of the discrimination personally, grew concerned, and independently brought the matter to Boone's attention. Though Plaintiff acted within the scope of his HR duties in doing so, this activity nonetheless constitutes protected activity.[5] Plaintiff satisfies the second element by submitting evidence that he personally informed Boone of his objections to the practice at issue. Boone would later participate in the decision to fire Plaintiff.

Plaintiff falters on the third element of a prima facie case for retaliation. Plaintiff must put forward evidence establishing a causal link between his protected activity and his termination. *See* Syl. Pt. 6, *Freeman*, 599 S.E.2d 695 at 697. Plaintiff argues, quite accurately, that temporal proximity between the participation in the protected activity and the adverse employment action can demonstrate causality. *Frank's Shoe Store*, 365 S.E.2d 251 (W. Va. 1986); *Conrad v. ARA Szabo*, 480 S.E.2d 801, 814 (W. Va. 1996) (noting that the inference of a causal link between protected activity and the adverse employment action typically "arises from a temporal proximity between the two" events).

"While there is no bright-line rule for temporal proximity, . . . a lapse of three to four months between the employer's knowledge of protected activity and the alleged retaliation 'is too long to establish a causal connection by temporal proximity alone.'" *King v. Pulaski Cty. Sch. Bd.*, 195 F. Supp. 3d 873, 886 (W.D. Va. 2016) (quoting *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233–34 (4th Cir. 2006)). The Supreme Court is in accord with this principle, previously observing: "The cases that accept mere temporal proximity between an employer's

---

[5] As one might expect, Boone disputes that he ever expressed a preference for younger applicants or evinced an intent to discriminate based upon age. (*See* Boone Dep. 237–39.) The fact that Constellium eventually hired the applicant in question further undercuts the assertion that age discrimination took place. For purposes of the summary judgment motion, the Court assumes the truth of Plaintiff's testimony.

knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close[.]" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).

The relevant conversation between Plaintiff and Boone occurred via email between April 13 and 15, 2015. (Boone Dep. 237.) Plaintiff recommended a candidate for a particular job and Boone responded that he "would like to see a younger individual so we can develop the team for the long term." (*Id.*) Plaintiff told Boone he could not consider age in hiring decisions. It is undisputed, however, that Plaintiff was not fired until approximately three months later. Given the months-long separation between the events at issue, the Court finds that Plaintiff cannot create a reasonable inference of causation based on temporal proximity alone. *See Pascual*, 193 F. App'x at 233.

Where temporal proximity is lacking, a plaintiff may demonstrate causation by providing "evidence of recurring retaliatory animus during the intervening period." *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)). Plaintiff has not put forward any evidence of other retaliatory occurrences. In fact, Boone testified that he accepted Plaintiff's advice and hired the individual Plaintiff recommended for the position. Ultimately, Rogers offers little more than speculation to support his causation argument. The Court need not reach *McDonnell Douglas* and its burden-shifting analysis because Plaintiff has failed to establish a prima facie case. The Court therefore **GRANTS** summary judgment on Plaintiff's age discrimination retaliation claim.

*ii.      Gender Discrimination*

Plaintiff pulls evidence for his gender discrimination retaliation claim from two sources. He bases the claim on evidence that a former employee of Constellium, having been accused of sexual harassment prior to the cessation of his employment, was later invited back to the Ravenswood plant to complete work, over Plaintiff's objection.   He also bases the claim on his contention that Stemple called female employees "bitches" after learning of their success in a lawsuit against Constellium.

The Court takes up the issue of Mosser's visits first.   Quite simply, Plaintiff fails to establish a prima facie case because there is no indication that he engaged in protected activity. Plaintiff alleges that Defendants retaliated against him for complaining about gender discrimination.   The Court is uncertain of the basis for Plaintiff's underlying claim of gender discrimination.   There is no evidence that Mosser engaged in gender discrimination or sexual harassment following the cessation of his employment.   Nor does the Court have basis to find that Stemple engaged in gender discrimination by granting Mosser access to company property.   The fact that Stemple permitted Mosser—who by that time worked for one of Constellium's customers—back on the premises for a brief tour does not give rise to a reasonable inference of gender discrimination.   Plaintiff may have opposed Stemple's conduct, but Stemple's conduct cannot be described, by any stretch, as an unlawful employment practice.   Without evidence of protected activity, the claim fails.

The alternative theory for this claim suffers from the same impediment.   With regard to Stemple's derogatory comment toward the female employees involved in the *Griffith* case, Plaintiff never testified that he confronted Stemple about the comments, nor that he expressed his

displeasure to anyone else.   Plaintiff asserts that he was "shocked" by the comments, not that he took any action in response to them.   (Rogers Dep. 275.)   The burden to establish a prima facie case does not present a particularly challenging hurdle, but Plaintiff's evidence on this claim is fatally deficient.   The Court **GRANTS** summary judgment in favor of Defendants on the gender discrimination retaliation claim.

> B.     *Race Discrimination*

Plaintiff does not present any direct evidence of race discrimination; thus, to avoid summary judgment he must proceed under the *McDonnell Douglas* pretext framework.   The elements of a prima facie case of discrimination are: (1) that the employee is a member of a protected class; (2) that the employee "provided competent, capable, and loyal service to [the] employer;" (3) that the employer made an adverse decision concerning the employee; and (4) that the employee was replaced by or treated less favorably than someone outside the protected class. *Barefoot*, 457 S.E.2d at 162 (citing *Conaway*, 358 S.E.2d at 423).

Defendants concede all but the second element of the prima facie case.   They contend that Plaintiff cannot prove satisfactory performance of his job responsibilities.   From the outset, it is apparent this factual dispute is better left for a jury's resolution.   Defendants rely, first, on a February 2015 performance review in which Plaintiff purportedly received a 2 out of 5 rating in "overall performance" and a score of 9, the lowest possible score, in the "potential for advancement" category.   Plaintiff attests that when he accessed his performance review in March of 2014, these scores were not listed.   (Rogers Aff. 4.)   He recalled a rating of 3 in overall performance.   (Rogers Dep. 270.)   Defendants counter that Rogers acknowledged receiving a rating of 2 by writing in the "Employee Comments" section of the evaluation, "I am disappointed

in receiving a rating of 2. That has never happened in my life as a professional." (Def. Mem. Support Mot. Sum. J. at 4, ECF No. 92.) Defendants ask the Court to disregard Plaintiff's self-serving statements in light of his comments on the evaluation. Without being afforded a chance to review the document at issue, the Court cannot do so.[6]

Defendants also argue that Boone scheduled a meeting with Plaintiff to discuss the performance review on July 2, 2015, but Plaintiff was a no-show. Plaintiff testified that he did not receive advance notice of the meeting, and a contemporaneous email supports his assertion. (ECF No. 92-2 at 80.) Plaintiff offers his own competing evidence demonstrating his job performance as satisfactory. For example, Boone testified that Plaintiff was 100 percent on target with individual achievement objectives in March 2015. (Boone Dep. 151.) Plaintiff backs his position with a lengthy list of projects that he successfully completed during his tenure. (Rogers Aff. 2–3.) The raise Plaintiff received in 2015 also undercuts Defendants' assertion that his performance was inadequate. Boone admitted that a performance level nine normally disqualifies an employee from consideration for pay raises. (Boone Dep. 149.) He claimed he awarded Plaintiff a raise because he "didn't want to discourage him." (*Id.*) This evidence creates a material factual issue on the question of Plaintiff's job performance.

Plaintiff's deficient performance serves as one of Defendants' stated reasons for the firing. As discussed in the precedent paragraph, Plaintiff has developed evidence to demonstrate this reason is pretextual. Defendants' other stated reason is Plaintiff's alleged submission of a

---

[6] It appears that Defendants intended to include the performance review as an exhibit to the summary judgment motion, but inadvertently failed to do so. Their supporting memorandum cites the review as page five of Exhibit 38 to Plaintiff's deposition. The document attached as Exhibit 38 is a single-page document, a July 2015 email from Plaintiff to Boone regarding Plaintiff's mid-year review. (ECF No. 92-2 at 80.) Attempts to locate the pertinent document among Defendants' other exhibits have been unsuccessful.

fraudulent affidavit in order to secure the purchase of his Texas home. Plaintiff has rebutted this evidence with testimony that he was not aware of a lien against his home, (Rogers Aff. 6), and that he promptly worked to resolve the matter once he realized the lien was likely valid. The Court cannot resolve this factual dispute without making impermissible credibility determinations. Further, Plaintiff avers that Constellium waited until the sale was complete before demanding money from him to cover the amount of the judgment lien. Had Constellium briefly postponed the sale, providing Plaintiff an opportunity to investigate the lien, it could have averted the unnecessary expenditure of tens of thousands of dollars. The fact that Constellium pressed forward with the sale gives rise to a reasonable inference that other motives were at play.

Defendants argue they are entitled to the "same actor" inference, which arises if an employee is "hired and fired by the same person within a relatively short time span." *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991). If the facts are right, they can "create[] a strong inference that the employer's stated reason for acting against the employee is not pretextual." *Id.* The same-actor inference does not mandate entry of summary judgment on Count V, for several reasons. First, *Proud* requires the two employment actions to be taken "within a relatively short time span," *id.* at 798, which the Fourth Circuit has construed in another case as within a "few months." *Buchhagen v. ICF Int'l, Inc.*, 545 F. App'x 217, 200 (4th Cir. 1991). In *Proud*, the plaintiff began his employment on June 14, 1985 and was terminated effective October 28, 1985. *Proud*, 945 F.2d at 796–97. Though Plaintiff was employed with Constellium less than a year, the duration of his employment was over twice as long as the *Proud* plaintiff's.

Further, although Boone was solely responsible for the decision to hire Plaintiff, the decision to terminate was made jointly by Boone and Stemple. (Stemple Dep. 137.) Viewing

this evidence in the light most favorable to Plaintiff, a genuine issue of fact remains as to whether Boone can be wholly credited with the decision to terminate Plaintiff, and thus whether the same actor inference should apply. *See Burgess v. Bowen*, 466 F. App'x 272, 280 n. 4 (4th Cir. 2012) (same actor inference is not appropriate where a factual dispute exists over who made the termination decision). The inference is further weakened in this case by evidence of direct discrimination, that is, Boone's racially-charged allusions to Plaintiff's genitalia. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573–74 (6th Cir. 2003) (reasoning that the rationale to apply the inference on summary judgment is stronger where evidence of direct discrimination does not exist).

Plaintiff has shown sufficient evidence of pretext for the Court to conclude that he raises a reasonable inference of discrimination. *Diamond*, 416 F.3d at 319. Thus, the Court **DENIES** the summary judgment motion on Plaintiff's race discrimination claim.

C.       *Racially Hostile Work Environment*

Plaintiff's remaining claim alleges a racially hostile work environment. The claim centers on Boone's joke comparing the penises of white and black men and his subsequent invocation of the joke on two instances while Plaintiff was using a urinal. To establish a claim for race discrimination on a theory of hostile work environment, the plaintiff must prove: (1) he experienced unwelcome harassment; (2) the harassment was based on race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003); *see also Erps v. W. Va. Human Rights Comm'n*, 680 S.E.2d 371, 378 (W. Va. 2009) (citing Syl. Pt. 2, *Fairmont Specialty Servs.*

*v. W. Va. Human Rights Comm'n*, 522 S.E.2d 180 (W. Va. 1999)).  Without question, Plaintiff

has demonstrated a triable question of fact on the first, second, and fourth elements of the claim.

At issue is the third element, that is, whether Boone's immature conduct was sufficiently severe

so as to create an intolerable work environment.  Defendants assert that even when assuming the

truth of Plaintiff's narrative, Boone's veiled comments about the size of Plaintiff's penis fall short

of this standard.

"Element three of a hostile work environment claim requires a showing that 'the

environment would reasonably be perceived, and is perceived, as hostile or abusive'; the plaintiff

may, but is not required to, establish that the environment is 'psychologically injurious.'"  *Boyer-*

*Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (quoting *Harris v. Forklift Sys.,*

*Inc.*, 510 U.S. 17, 22 (1993)).  A court determines whether conduct rises to this level by examining

the totality of the circumstances.  Specifically, the court should consider "'the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work

performance.'"  *Id.* (quoting *Harris*, 510 U.S. at 23).

"Unlike other, more direct and discrete unlawful employment practices, hostile work

environments generally result only after an accumulation of discrete instances of harassment."

*Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 339 (4th Cir. 2006) (citation omitted).  By contrast,

infrequent, isolated incidents of harassment are rarely actionable under a theory of hostile work

environment.  *Boyer-Liberto*, 786 F.3d at 277 (noting isolated incidents of harassment may be

sufficient to alter the conditions of employment if "extremely serious").  Simple teasing and jokes,

even when related to protected status, are "ordinary tribulations of the workplace" and typically

are not extreme enough to create a hostile work atmosphere. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted)); *see EEOC v. Fairbrook Med. Clinic, P.A.,* 609 F.3d 320, 328 (4th Cir. 2010) ("Activities like simple teasing, offhand comments, and off-color jokes, while often regrettable, do not cross the line into actionable misconduct." (citation omitted)). The status of the harasser may be a factor as well because "'a supervisor's power and authority invests his or her harassing conduct with a particular threatening character.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998)).

At most, Plaintiff alleges that Boone made disparaging race-based remarks on three occasions. Boone shared the joke at issue in December 2014; Plaintiff was terminated in July 2015. Three comments during a seven-month period are not particularly frequent. *See Sonnier v. Diamond Healthcare Corp.*, 114 F. Supp. 3d 349, 357 (E.D. Va. 2015) (describing three instances of harassment during a two-month period as "relatively infrequent[]"); *but see Tawwaab v. Virginia Linen Serv., Inc.*, 729 F. Supp. 2d 757, 777 (D. Md. 2010) (finding a reasonable juror could determine ten incidents of racial harassment over the course of two years sufficient to support a hostile work environment claim). In any event, the frequency of the alleged harassment is not dispositive in this case. Plaintiff's claim fails because Boone's teasing was not sufficiently severe.

When viewed in the context of Boone's joke, a reasonable juror might interpret the comments made in the restroom as relating to Plaintiff's race. More likely, this was, at best, an awkward attempt at crude humor and, at worst, a boorish instance of teasing. While one might expect this sort of behavior in middle school, it is certainly beneath grown, professional men. Nonetheless, a comment of this nature is categorically distinct from unambiguous racial epithets.

However, even the use of such epithets may not sustain a hostile work environment claim if not sufficiently pervasive. *See Oladokun v. Grafton Sch., Inc.*, 182 F. Supp. 2d 483, 493 (D. Md. 2002) (finding two instances of the use of the "n-word" insufficient to establish a hostile work environment claim). Here, Boone's comments were neither particularly egregious nor pervasive.

Plaintiff's claim also suffers from a lack of evidence suggesting that the joke and related comments unreasonably interfered with Plaintiff's work performance. Plaintiff testified that he was on "pins and needles" when interacting with Boone, (Rogers Dep. 314), but did not offer specific examples of how his supervisor's comments prevented him from ably performing his job. In that regard, it is worth noting that Boone and Plaintiff worked on separate continents. While Plaintiff communicated with his supervisor via email on a regular basis, they did not routinely share the same physical workspace and had limited opportunities for in-person interaction.

Boone's behavior was inappropriate, to be sure. Any comment about as intimate a matter as another's genitalia may cause offense, particularly when coupled with racial innuendo. Still, the Court must find that Boone's behavior was not so grave, nor so frequent, as to alter the conditions of Plaintiff's employment and create an abusive work environment. Summary judgment is appropriate on Plaintiff's hostile work environment claim.

### IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the Motion for Summary Judgment. (ECF No. 92.) On Counts I, II, V, the motion is **GRANTED**. These claims are **DISMISSED WITH PREJUDICE**. The Court **DENIES** the motion as to Count IV. The Court renders no decision as to Count III, as Plaintiff voluntarily dismissed this claim with Defendants' consent following the filing of the summary judgment motion.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        April 28, 2017

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE